ALBE DAVISON, petitioner, *vs.* THE STATE OF VERMONT.

ORANGE,
*March,*
1832.

A petitioner has no claim in law, or equity, or by any analogy to the principles of law or equity, against the state, for monies he has been compelled to pay in consequence of being bail for one, who obtained an act of suspension, and departed from the liberties of the prison, and the act of suspension has been adjudged to be unconstitutional.

The petitioner presented his petition to the county court, at December term, 1831, pursuant to the provisions of the statute of 1831. The county court decided against him, and he excepted to their decision, and brought his case up to this Court under the provisions of said statute. The facts found by the county court, and certified in the bill of exceptions are these : In the fall of the year, 1821, one Charles Preston, of Brookfield, was a prisoner within the liberties of Chelsea jail, and the petitioner was his surety to the sheriff for the liberties. He was imprisoned on an execution in favor of Alden Spooner, then of Windsor. Preston, without the consent or knowledge of *Davison,* petitioned the legislature for, and obtained, an act of suspension, in what had been the usual form of such acts, freeing his body from arrest or imprisonment for five years; and purporting to authorize him to leave said liberties, upon his lodging a true and attested copy of said act with the keeper of the prison. He accordingly lodged such copy with the jailer, and departed from the liberties. *Davison* was afterwards sued on said bond, and made defence ; but the court adjudged against him, on the ground that said suspension act was unconstitutional ; and he was obliged to pay, and did pay, the whole debt, amounting to about six hundred and sixty two dollars, besides his cost of defending the suit. After collecting all, that could probably ever be collected of Preston, there remained due to the petitioner upwards of three hundred and fifty dollars. The prayer of the petition was, that the court would allow him this sum against the state, according to the provisions of the statute of 1831. That statute authorized the court to make this allowance against the state, if they found the petitioner entitled to such relief,

ORANGE,
March,
1832.

Davison
vs.
The State.

*either legally*, or *in analogy to the principles of law*, or *according to the principles of justice and equity*.

*Mr. Nutting, for the petitioner*, after presenting a full view of the facts in the case, argued as follows:

All these facts the Court say, " we have no difficulty in finding;" and the only question presented to the Court is, whether these facts do " legally, or in analogy to legal principles, or according to the principles of justice and equity," entitle the petitioner to remuneration from the state.

We are not now to enquire, whether the act in question is in fact unconstitutional or not. It has been *decided* to be unconstitutional, and that, in the words of the statute, entitles the petitioner to claim remuneration. It is no matter whether the legislature exceeded their authority in passing the act, or whether the Court erred, or were corrupt, in deciding it unconstitutional: in either case, the petitioner's claim was equally good. Both the legislature, and the judiciary, are, in their several spheres, the state of Vermont. The legislature is the *state* in its legislative capacity ; and the Supreme Court is the *state* acting judicially. Both are vested with the authority of the state, which no individual can, with impunity, resist. And whether the general assembly or the court erred, is of no consequence to the petitioner: his money has been forced from him *by the authority of the state of Vermont ;* and the question is, whether the authority of the state of Vermont will restore it. Whether this Court will, because they have the power, say to the petitioner, " you have no remedy ; you cannot *compel* the state to do you justice ;" or, in the language of the county court, your claim is not *legally* binding on the state ; for the legislature, in passing the act complained of, exceeded their powers ; and the *law* says, " the principal is not bound by the acts of his agent, unless the agent keep strictly within his powers." Or, will not this Court rather say, the cold maxims of municipal law are wholly inapplicable to the present case ; for, as a sovereign state is not amenable to any human tribunal, so neither are its actions determined by any human law, but solely by its own sense of what is just, of what is right, of what is becoming its own dignity. The sovereign state of Vermont has, by the fault of its legislature or judiciary, no matter which, occasioned a loss to this petitioner ; and it is just and right, and becoming its own dignity, that the sovereign state of Vermont should make him remuneration. It is not contended, that this claim " is legally binding on the state." Laws are binding on subjects only, not on the sove-

ORANGE,
*March,*
1832.

Davison
*vs.*
The State.

reign.    Sovereign power is above the reach of law.    Yet "these,"
(in the language of *St. Paul,* too often forgotton,)  " not having
the law, are a law to themselves ;"  they are bound by the immu-
table principles of right and justice, which are equally obligatory
on the sovereign and the subject.

We come then to enquire whether this claim is, in the words of
the statute,  " according to the principles of *justice and equity,*
binding on the state."    And here it may be well to examine
the relation that exists between the state and a citizen.    Is it
that, which exists between two citizens, two equals ?  By no means.
It is rather the relation of parent and child ; of superior and infe-
rior ; of sovereign and subject.    *" Patria nostra,"* says Cicero,
*" quae est communis parens omnium nostrum."*    The parent has
the right, and the power, to control the actions of his child, and is
bound to protect and indemnify his child while acting in obedi-
ence to his commands.    So the state has a right to enact laws,
for regulating and controlling the conduct of its citizens, and the
power to enforce obedience to those laws ; and is equally bound to
protect and indemnify the citizens in rendering that obedience.
The parent, though not bound by his own laws, is bound by a
higher, the law of the state:    So the state, though not bound by
its own laws, is bound by a higher, the law of God, the principles
of justice and equity, the eternal rule of right.    But what are
" the principles of justice and equity."    What did our legislature
mean by use of these words in the statute, under which this peti-
tioner claims ?    Did they mean *that* justice, which is to be ob-
tained in a court of law, or *that* equity, which is meted out in our
courts of chancery ?    Did they mean to say to this Court, " if
you shall be of opinion, that the petitioner could sue the state at
law, or bring his bill in chancery, and enforce his claim, you may
order remuneration ?    By no means.    The legislature knew that
the state could not be impleaded in a court of law, or equity.
They must, therefore, have intended the expression, " principles
of justice and equity," to be taken in its most general and com-
prehensive sense.    And what is that sense ?    " Justice," says the
*Cyclopedia,* " in a general sense, or *universal* justice, comprehends
the whole duty of man to God, to his neighbor and to himself.
Justice, in a more restricted sense, and considered as a social vir-
tue, denotes a constant desire, or inclination, to give every one
his due ; or a habit, by which the mind is disposed, and deter-
mined, to give every one his own."    And " equity," as defined
by *Grotius,* " is the correction of that, wherein the law, by reason
of its universality, is deficient."    Or, in the language of *St. Paul,*

ORANGE,
*March,*
1832.

Davison
*vs.*
The State.

again, "what the law could not do, in that it was weak," equity steps in to accomplish.

Let us apply the principles of justice and equity, as here defined, to the present case. And can there be a doubt, that the state must remunerate the petitioner? The first duty required of citizens, is obedience to the laws of the land : and this duty is not only enjoined by the laws of the land, but by the law of God. It is not only a civil, but a religious duty. "Let every soul be subject to the higher power ; for, the powers that be are ordained of God." "Observe every ordinance of man as unto the Lord," or as a religious duty. In the present case, the legislature passed an act, which,though deemed constitutional at the time, has since been decided unconstitutional. The petitioner,and all connected, rendered due obedience to that law, as they were bound to do ; and, as a necessary consequence, the petitioner has, by the laws of the land, been deprived of a great share of his property ; and now, who, upon principles of justice and equity, shall sustain this loss? If this were a case between two citizens, would not the whole world answer, he, who caused the loss, must bear it? I fall a tree upon my own lot, and contrary to my intention, it falls across the fence, and kills my neighbor's cattle. Who must sustain the loss? Not only the principles of justice, but our courts of law, say, I must bear it. And why? Not because I intended my neighbor harm ; but because, through my act, the loss occurred. So if I, unintentionally, drop fire in my neighbor's barn, by which it is consumed, I must pay the damage ; because I occasioned it. And suppose I direct my son, or my hired labourer, to go to such a lot, and cut such a particular tree ; and he, not doubting my right to the tree, obeys : but it happens the tree is on my neighbor's land, and my labourer is prosecuted, and amerced in a fine and costs. Though the policy of our laws, for the prevention of trespasses, gives him no remedy upon me, would those laws justify me hereafter, at that tribunal, where not the *"policy of the law,* but the *principles of justice,"* dictate the decree? And would not the whole world indignantly cry, *shame upon me,*if I refused to repay him every farthing he had expended? And should I attempt to shuffle and reply, "I verily thought the tree was mine ;" "no matter." would be the answer ; "you caused the act to be done, and you must bear the consequences." The state of Vermont, in their legislative capacity, have mistaken their powers, and passed an unconstitutional act, which has brought a heavy loss upon this petitioner ; and *shame ! shame !* be to the state, if they do not remu-

ORANGE,
March,
1832.

Davison
vs.
The State.

nerate him.  I trouble no man's books for authorities in this case : I appeal to no authorities in a case so plain.  God has implanted in all his intelligent creatures a sense of right and wrong ; and to that sense, implanted in the breasts of this honorable Court, I appeal for support in the positions I have taken.

We have thus far presented the case as between two citizens—two equals.  But take it as it is ; the state and the petitioner, standing to each other in the relation of parent and child, or sovereign and subject ; and are not the obligations of the state to remunerate the petitioner strengthened ?  I appeal to those of this honorable Court who are parents, and particularly to his honor, the *Chief Justice,* with whose parental affections and sense of parental obligations, and duties, I am in some measure acquainted.  Suppose his honor, on leaving home for this circuit, had called his little son, and said, " my son we have provided an excellent school master ; you must be a good boy, attend school constantly, and be obedient, and do whatever the master bids you.  Suppose, that, on his honor's return, he finds that the master had requested his son to run to such a house, whose occupant was absent, and bring him such a book ; his son had obeyed, had been prosecuted for stealing the book ; and, right or wrong, had been sentenced to pay a fine and costs, and stand committed till sentence of court be complied with, and was then actually in prison.  Suppose, that, on hastening to the prison, the son should say, father, I did just as you bid me.  I obeyed the master, and have been shut up in this cold dark room a month for it ; and am almost starved : will you suffer me to remain here always for doing as you bid me?  What would his honor answer, when tears would permit him to speak ?  Would he say, in the language of the county court, "the master had no right to send you for the book ; you should have examined his authority before you obeyed him.  I can afford you no relief."  Or rather would he not answer, "God forbid, my son, that you should suffer this wrong.  It was the master's fault, or rather it was my fault, in not providing a more discreet master, and mine shall be the punishment, whatever it be."  The man would be a beast who could answer otherwise.  How far is this supposed case from being parellel to that on trial ?

Can any claim or laches be imputed to the petitioner ?  The legislature, without the knowledge of the petitioner, " by the authority of the state of Vermont," enacted, that the body of Charles Preston should be free from arrest and imprisonment for the term of five years ; and further *commanded* all sheriffs, jailors, and other officers, having the said Charles in custody, on receiving a certi-

ORANGE,
March,
1832.

Davison
vs.
The State.

fied copy of this act, to release and discharge him. And Preston had lodged a certified copy of the act with the jailor, and was discharged, before the petitioner knew of the passing of the act. What opportunity, then, had the petitioner to examine the *author- ity* of the legislature to pass the act, scores of which they had been passing every session, for more than twenty years preceding, and which the state, in its judicial and executive power, had, at least by acquiescence, sanctioned during the whole of the time ? But suppose he had examined the constitution, and discovered that the act was unconstitutional, and suppose he had made this dis- covery before Preston left the liberties ; how could he have pre- vented it ? If he had availed himself of the statute of 1812, and recommitted him, or attempted to recommit, would an officer have served a precept upon him in defiance of the act ? If he had succeeded in recommitting him, had we a court in the state of Vermont, which would not have liberated him on a *habeas corpus?* and if Preston had sued both the petitioner and his officer for false imprisonment, was there a court in the state, which would not have given judgement against them ? How cold hearted, how cruel, to wish that the state should refuse remuneration to this petitioner, because he did not resist a law of the state, which, at that time, he, with all the rest of the state, believed constitutional ! which he had not the power to resist, and for resisting which, if he could have done it, the state would have most certainly punished him ! Suppose a foreign despot, who unites in himself supreme, legislative, judicial, and executive power, should himself arraign, try, condemn and execute, a subject for doing what he had ex- pressly commanded, should we not call him unjust, cruel tyrant ? Is the state of Vermont ambitious of that character? and will this honorable Court, by refusing remuneration to this petitioner, help to affix it upon her?

The case is to me very plain ; but to make it still plainer : in the case before put, when the hired labourer had to pay a fine and costs for cutting timber by my express orders, and which he verily believed to be on my land ; suppose this laborer applies to an at- torney to know whether the law would not compel me to remu- nerate him. The attorney says, " no, the law compels no con- tribution in trespass." Says the laborer, " you have courts of equity, will not they compel him to pay me?" " No," says the lawyer, " they take no cognisance of such matters, or the prin- ciples of equity, found in the books on this subject, do not differ from the law." " But," says the laborer, " I appeal to you as an

ORANGE,
*March,*
1832.

Davison
*vs.*
The State.

honest man, *ought* he not on *principles* of *justice* and *equity* to remunerate me ?" " Aye, indeed, he ought, and he is a scoundrel if he does not repay you the utmost farthing." "Very well," replies the laborer, " I have no reason to doubt you decided right *as a lawyer ;* but I know you have decided right as an *honest man,* and the decisions are very different, and hereafter, let me tell you, I shall take my causes for decision, to honest men rather than to lawyers." With precisely these views, the petitioner brings his claim before this honorable Court for decision ; and he asks them, whether the state *ought* not on *principles* of *justice* and *equity* to repay him the money, which has been taken from him by their unconstitutional act. He knows, that, by the ordinary rules of procedure in our courts of law and equity, he can obtain no redress. But he also knows that this Court are a special tribunal, have a special commission to try and determine cases of this kind, and that they are to be decided " according to the principles of justice and equity." If the *principles of justice and equity* in this commission, in this statute, mean no more than that scanty pittance of either, which our courts of chancery, shackled and trammeled as they are with the forms, precedents, rules, and decisions of a thousand years, are now enabled to deal out, he may have doubts : but if they mean the *inscrutable rules of right* ; if they are to be taken in their common acceptation ; in short, if they are to be construed as the *honest man,* not the *lawyer,* would construe them, he can have no fears.

It may not be improper to enquire, what was the object of the legislature in passing that act ? To consider the old law, the evil, and the remedy. By the old law, or previous to this remedial statute, petitioners applied directly to the legislature. What was the evil of this ? The difficulty, or rather the impossibility, of procuring all the facts relative to the several petitions. To remedy this evil, and this only, as it appears to me, the act of 1831 was passed, giving cognisance of this class of claims to the county court, with appellate jurisdiction to this Court. Will it be pretended, that the legislature intended to constitute the several county courts keepers of its conscience ? to instruct in its duty ? to inform what it ought to do, in any given state of facts ? I believe our legislature have never been accused of any such unreasonable degree of modesty. But this might, with more plausibility, be contended had the legislature never acted upon similar cases, and thus manifested their sense of the obligation of the state to remunerate such sufferers, in repeated instances. The case of Parley Davis,

ORANGE,
March,
1832.

Davison
vs.
The State.

Orange Fifield, Simeon Wright, Conrade Sax, and many others within the recollection of the Court, show clearly, that the state has invariably recognised its obligations to remunerate all those who have proved themselves to have sustained losses in consequence of rendering obedience to unconstitutional legislative acts. And the object of the statute of 1831 was merely to ascertain with greater certainty and facility, who had in fact so suffered, and the amount of their several losses; and not to ask the opinion of the several county courts, whether the state ought to remunerate these losses when proved.

As the county court have found all the facts in this case, we trust this honorable Court will decree remuneration to the petitioner, to the extent of his loss, as found by the county court; and we believe, that they would as readily decree him his interests and costs, did the statute leave them at liberty so to do.

*Mr. Buck, state's attorney,* for said county, was asked by the Court, if he was disposed to present any observations on the other side, and he answered in the negative.

*The opinion of the Court was pronounced by*

HUTCHINSON, C. J.—The Court have fully considered this subject, and are all perfectly agreed in the result, to which we have arrived, except Mr. JUSTICE ROYCE, who declines saying any thing about it, on account of the situation, in which similar statutes have placed him, and some of his friends and connexions.

It is important that we ascertain, as correctly as possible, by what rule the legislature intended we should be governed in exercising the powers given by the statute of 1831. The expressions of the statute authorizes the relief sought, if the petitioner is entitled, either *legally or in analogy to the principles of law*, or, *according to the principles of justice and equity*. There is no pretence of his being *legally* entitled to this relief. If he were thus entitled, he would bring an action instead of his petition. What is intended by his being entitled to relief by *any analogy to the principles of law?* This probably means, that the court should grant the relief sought, if the petitioner makes out such a claim as would be recoverable at law, if the state were liable to an action at law. So if he makes out such a claim as would entitle him to relief in a court of chancery, if the state were liable to a suit in such court, this would entitle him to relief now, according to the principles of justice and equity. I know not what further than this

the legislature could mean. They surely could not mean that we should do that justice and equity to the petitioner, which would be doing equal injustice, and be the contrary of all equity, as regards the state.

ORANGE,
March,
1832.

Davison
vs.
The State.

This claim is founded on a supposed wrongful act of the state, in their legislature's passing a suspension act in favor of Preston, which, in its result, has occasioned a loss to the petitioner ; and the case shows, that this act passed without the consent or knowledge of the petitioner. Similar statutes have, heretofore, been frequent in this state ; and they have been enacted in answer to the petition of some person confined in prison for debt. And, usually, notice of such petition has been given to the creditors, by personal service, or by a publication in some newspaper, that is circulated among them. Usually, also, the friends of the petitioner have exercised their friendship in aiding his petition, and convincing the legislature of the propriety of granting it. In process of time, these statutes have been decided to be unconstitutional, and void. This was first decided by the circuit court of the United States ; and, afterwards, by the Supreme Court of this state.

When Preston applied to the legislature for his act of suspension, he considered himself as asking a favor. They granted his request, and enacted the statute in question. They thought they did him a favour by passing the act. They did it without fee or reward. They were all honest, and supposed they were doing what was right. They were as honest and humane, in granting this favor, as Preston was honest and fervent, in his petition for it. He supposed it would be beneficial to him, or he would not have asked for it. The supposed benefit to him was the only motive for their granting it.

Now, we do not know that such a thing was ever heard of since the world began, as that he, who complies with the request of another, and does him a kindness, without fee or reward, was considered liable for any injurious consequences of such kindness. He heard his request ; he saw his distress ; he honestly supposed the granting that request would be a kindness. He granted that request. It proved not to be that kindness that was intended and supposed. It proved an injury to him, or his friends. No system of morals, ever published, contains an intimation that this benevolent donor is holden to make good that injury.

Look at the daily occurrences in life. A man lends his poor neighbor a horse to carry his grain to mill. He expects no reward. In going to mill the horse, for the first time in his life, falls

ORANGE,
March,
1832.

Davison
vs.
The State.

under his burden.   In falling, he breaks the   poor  man's leg; or he becomes terrified and veers, and breaks down another  man's fence;  or, while waiting for his grinding, the poor man commits a trespass, which he would not have  been there to commit, if he had not borrowed the horse.   Is the owner of this horse to be punished for his benevolence, by making good all these damages? No one will pretend this.   The cases of  cutting trees, stated by counsel, are not so stated as to form a  parallel with this.   In all those cases, where the counsel set his laborers at work for his ben- efit, and the injuries happened, which he has stated, he would be liable to make good those injuries.   He would be liable, not only upon principles of justice and  equity,  but upon  principles of law.   He set his laborers at work for his benefit.   He  set them about his own work.   He did not tell them to go and  commit  a trespass ;  but to go and labor for him  in his ordinary business. As between him and his hired  man, the latter was no  trespasser. If the owner recovers against this hired man, no law  to prevent a contribution among trespassers, will be in the  way of this  hired man's recovering an indemnity of his employer.

We may  vary this case, and make  it more  parallel.   Take away the circumstance that the counsel set his laborers at work, and told them where to work ;  take away the circumstance, that he set them at work for his own benefit ;  and let him be applied to by a neighbor for licence to cut  a particular tree on his land : he grants the licence without expecting any  compensation,  and both honestly believing the tree to be  on his  land.   The  tree is cut, and carried away and used.   It turns out, that this tree stood upon another man's land : the owner sues the man  who cut it, and recovers his damages.   Would this  counsel admit—would  any one pretend—that he  was liable to  remunerate  these damages? We believe not.   Had he sold the tree, supposing it to  be upon his own land, that would have made a different case.   So if  the legislature had made a grant to Preston of some property,  which it was supposed the state owned, and the state had received from him a compensation for it.   It turns out that he can have no ben- efit from the grant, because the  state did not own  the property. In such a case, in analogy to the principles of  law, as well as  ac- cording to the principles of justice and equity, the state ought  to refund the money he paid them, and  interest upon it.   Whether he would be entitled to receive any thing more, for losses connect- ed with his purchase, would depend much upon the question how far he prudently relied upon his grant, till these losses were incur-

red. But, if this grant had been made in good faith, all believing that the state had a right to make the grant of this property, and no compensation was made or expected for it; if it was a mere gift; no after circumstances of the loss of this property could give Preston the least possible claim against the state for remuneration, either legally, or in analogy to the principles of law, or according to the principles of justice and equity.

ORANGE,
*March,*
1832.

Davison
*vs.*
The State.

The counsel for the petitioner urges, that Preston acted in *obedience* to a law of the state. This is not a happy expression to describe the true case. When statutes are made to regulate the conduct of citizens, and requiring their obedience to rules prescribed in those statutes, those, who observe these rules, may talk of obedience to these statutes. But a man who acts for himself, in his own concerns, and governs himself by his own views of prudence, is compelled to no particular course by any statute, but acts under a mere gratuitous grant, made at his request, and for his benefit, which benefit he may try to enjoy, or let it alone, just as suits his convenience. Such a man should not use the word *obedience* to describe his own actions. His *obedience* was to his own will, not to any statute; to a mistaken view of his own interest, not to the requisitions of the state.

What is now said may, also, serve to correct the view presented of a boy, who, in obedience to an indefinite, and, perhaps, an unwise command, commits a mere trespass, and is prosecuted for a theft. The command and obedience form the whole of the case, thus stated. Preston acted under no command of the legislature; he exercised no obedience to any such command.

It is urged, as a ground of equity, that the petitioner, the bail of Preston, knew nothing of Preston's petition, till his difficulty was brought upon him. This circumstance may add to his hardship, as between him and Preston, but gives him no equity as against the state. Preston ought to have let his bail know of his petition, and of his statute, before he departed from the liberties of the prison. But the legislature were under no obligation to give him any notice of either. When he became bail for Preston, he undertook the risk of whatever voluntary act of Preston might operate to charge his bail. The procuring this statute, and acting under it, were as much the voluntary acts of Preston, as would have been the departing from the liberties without such an act. If the petitioner was ignorant of these proceedings, the blame rests alone on Preston, whose duty it was to inform him. He ought not to have departed from the liberties, till he had made known to his bail the reasons

ORANGE,
March,
1832.

Davison
vs.
The State.

why he was about to do it, and obtained the consent of his bail; or thereby given his bail an opportunity to discharge himself by a recommitment of his principal, as he might have done by virtue of a general statute.

It is not easy to believe that a remuneration would be thought of, in this case, if an individual were substituted in place of the state. Suppose an individual, having funds in a distant bank, had felt disposed to relieve Preston, and had drawn him a regular draft upon this bank for a sufficient sum to afford him full relief, and had delivered him this as a mere gratuity. Preston receives it thankfully; and, instead of waiting to get his money and pay up his debt, he is so sure of his money in a few days, that he ventures to depart from the liberties. The bank fails, and the draft becomes of no use; and the money is collected of the petitioner, as it has now been collected. In the progress of these proceedings, the petitioner was as ignorant of what was doing, as he has now been. Would the petitioner pretend, or any one in his behalf, that he had any sort of claim, even in the lowest grade or kind of equity imaginable, to a remuneration from the benevolent individual who drew the draft? We presume not. And yet, that benevolent act was, in one sense, the cause of this burden coming upon the petitioner.

Should full effect be given to the reasons, urged in behalf of this petition, the consequences would be alarming. The general assembly are treated as the state in their legislative capacity, and the courts as the state in their judicial capacity. From this view, the state are to be made responsible to every citizen for every injury he may sustain, even collaterally, from every mistake in the legislature, let them act ever so honestly, and with the utmost disinterestedness and liberality. The same argument would apply with equal force to bind the state to make good, to each individual, the loss he may sustain by a wrong decision of the Court. Indeed, this forms one horn of the dilemma in the present case. If the position is tenable, in this case, it will be so in every other, where the body applied to for relief are satisfied, that a wrong decision has been made to the injury of the applicant. But there is a sort of counterpart to this argument, interwoven in the argument itself, while the argument presents all possible equity, that can be found in the one, who is to receive the money, we are led to search for an equitable payer; some, concerning whom, it will be just and equitable to compel them to pay this money. If the foregoing observations are correct, there is no more equity, that the

whole state should pay this money, than, that any portion of the inhabitants should pay it; or that the petitioner should bear the burden alone. The hardship may be less, because the whole state is more able to pay. But that is no tenable ground to ascertain, or regulate, equity. The rich and the poor must be governed by, and enjoy, the same rules of justice and equity.

Upon the whole, we discover no ground to allow this claim,either from legal obligation of the state, or from any analogy to the principles of law, nor according to the principles of justice and equity ; nor, we may add, from any principle of fair deal among men. If it is allowed at all, it must be allowed from a principle of generosity merely. We have no right to allow it from that principle. The legislature could not have intended to give us power to allow claims upon that principle. They have no right to pass a law that would give such power. They have no right to pass a law that would take the money from the people and give it away. If they give at all, they must give as individuals, and that from their own purses ; and not, as legislators, give from the purse of the people.

> The judgement of the county court, which disallowed the claim of the petitioner, is affirmed.